**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joaquin Emilio MESA–RINCON, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Peter Scott STOPPE, Defendant–Appellant.**

Nos. 88–2459, 88–2539.

United States Court of Appeals, Tenth Circuit.

Aug. 16, 1990.

Michael L. Harris, Asst. Federal Public Defender (Charles D. Anderson, Federal Public Defender, with him on the brief),

Kansas City, Kan., for defendant-appellant Mesa–Rincon in 88–2459.

Robert S. Streepy, Asst. U.S. Atty. (Benjamin L. Burgess, Jr., U.S. Atty., and Leon J. Patton, Asst. U.S. Atty., on the brief), D.Kan., Kansas City, Kan., for plaintiff-appellee in 88–2459.

Robert M. Haggard, Miami, Fla., submitted on the brief, for defendant-appellant Stoppe in 88–2539.

Benjamin L. Burgess, Jr., U.S. Atty., and Leon J. Patton, Asst. U.S. Atty., D.Kan., Kansas City, Kan., submitted on the brief, for plaintiff-appellee in 88–2539.

Before McKAY and BRORBY, Circuit Judges, and BOHANON,[1] Senior District Judge.

McKAY, Circuit Judge.

Defendants Mesa–Rincon and Stoppe appeal from a Judgment filed after their conviction under a conditional plea of guilty to counterfeiting. We consolidated the two appeals because they present virtually the same issues for review and the underlying facts are identical.

## I. Facts

On March 15, 1988, the United States Secret Service applied for an order to authorize the interception of nonverbal conduct via closed circuit television to be installed by surreptitious entry. The application was approved by the district court the same day it was filed. The district court's order authorized the interception and recordation of nonverbal conduct in a specified building in Lenexa, Kansas. The order also authorized the surreptitious entry by Secret Service agents to install and maintain the video surveillance equipment.

On March 16, 1988, the Secret Service installed a television camera at the authorized location. Government agents later used the television camera to observe and record both defendants counterfeiting United States currency. The agents also observed other activities, including an apparent act of masturbation by an unknown male who had entered the premises in a manner not known to those conducting the surveillance.

Defendants moved to suppress all video evidence in the district court. The district court denied the suppression motion and subsequently entered a judgment pursuant to defendants' conditional plea of guilty. Defendants reserved the suppression issue for appellate review in their conditional guilty plea. Defendants now challenge the video evidence on three grounds. First, they claim that the district court did not have statutory or inherent power to authorize this type of search. Second, defendants argue that the application for surveillance did not satisfy traditional fourth amendment requirements. Finally, defendants claim that the government failed to follow the limitations for television surveillance required by *United States v. Torres*, 751 F.2d 875 (7th Cir.1984).

Defendant Stoppe presents one separate issue dealing with sentencing. Mr. Stoppe argues that his full confession, his implication of his accomplice, and his full cooperation with the government justified a departure below the sentencing guidelines.

## II. Standard of Review

The district court's power to authorize video surveillance, and the sufficiency of that authorization, present questions of law. The application of the sentencing guidelines is also a question of law. We review questions of law de novo. *Bill's Coal Co. v. Board of Public Utilities*, 887 F.2d 242, 244 (10th Cir.1989). When using the non-deferential de novo standard of review, the appellate court is not constrained by the district court's conclusions of law. *United States v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir.1986); *State Distrib. Inc. v. Glenmore Distilleries*, 738 F.2d 405, 412 (10th Cir.1984). The appellate court must review the record in light of its own independent judgment. *See Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988).

1. Honorable Luther Bohanon, United States Senior District Judge for the Eastern, Northern, and Western Districts of Oklahoma, sitting by designation.

### III. The District Court's Power to Authorize Covert Television Surveillance

■ Defendants argue that the district court is without statutory or inherent power to order covert television surveillance. We hold that Fed.R.Crim.P. 41(b) grants authority to the district court to authorize the surveillance that took place in this case.[2]

Rule 41(b) authorizes the issuance of a warrant to:

[S]earch for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; or (4) person for whose arrest there is probable cause, or who is unlawfully restrained.

Fed.R.Crim.P. 41(b). The Supreme Court has interpreted Rule 41 to authorize the issuance of a search warrant to install a "pen register," a device that records the phone numbers dialed from a telephone. *United States v. New York Telephone Co.*, 434 U.S. 159, 169, 98 S.Ct. 364, 370, 54 L.Ed.2d 376 (1977). The *New York Telephone* Court stated that Rule 41 "is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause." *Id.* at 169, 98 S.Ct. at 370. *See also Katz v. United States*, 389 U.S. 347, 355–56 n. 16, 88 S.Ct. 507, 513–14, 19 L.Ed.2d 576 (1967); *cf. Osborn v. United States*, 385 U.S. 323, 329–31, 87 S.Ct. 429, 432–34, 17 L.Ed.2d 394 (1966). Thus, although the language of Rule 41 concerns conventional searches, the Supreme Court has interpreted the rule to cover "electronic intrusions," including wiretaps. *New York Telephone*, 434 U.S. at 169, 98 S.Ct. at 370.

Relying primarily on *New York Telephone*, two circuit courts have held that Rule 41 authorizes district courts to issue warrants for video surveillance. *See United States v. Torres*, 751 F.2d 875, 877–78 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985); *United States v. Biasucci*, 786 F.2d 504, 509 (2d Cir.1986). We are in agreement with the Seventh Circuit's statement that "[w]e cannot think of any basis on which the rule might be thought sufficiently flexible to authorize a pen register, bug, or wiretap, but not a camera." *Torres*, 751 F.2d at 877–78. Thus, we conclude that Rule 41(b) provides the district court with authority to issue the order involved in this case.

### IV. Search and Seizure Requirements

■ The fourth amendment states that "no Warrants [for searches and seizures] shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, the fourth amendment creates two requirements for all search warrants. There must be probable cause supported by an oath or affirmation and a particular description of the place, persons, and things to be searched and seized.

In many search and seizure areas Congress has specifically defined the probable cause and particularity requirements of the fourth amendment. *See, e.g.*, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1988); the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–11 (1982). The failure of the government to comply with the statutory requirements for intrusive search techniques such as wiretaps and bugs results in suppression of the evidence obtained.

[C]ongress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations

---

**2.** As a result of our holding, we need not discuss the other asserted bases for the district court's authority.

clearly calling for the employment of this extraordinary investigative device. *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974). Unfortunately, Congress has not yet specifically defined the constitutional requirements for video surveillance. Nevertheless, the general fourth amendment requirements are still applicable to video surveillance; and suppression is required when the government fails to follow these requirements.

Although Congress has not yet delineated the requirements for video surveillance, we find guidance in case law and congressional enactments concerning similar search and seizure techniques. We have considered carefully the underlying purposes of the fourth amendment and the intrusiveness of video surveillance. Having done so, we now adopt the following five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the fourth amendment. These requirements have been formulated for other search techniques, and we hold that they must be satisfied before video surveillance will be permitted. An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime; (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment; (3) the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation; (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous;

and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days.

We adopt these five requirements from three separate sources that discuss search techniques similar to video surveillance: Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1988); the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–11 (1982); and the common law concerning audio surveillance prior to the passage of Title III. Each of these sources contains at least four of the five requirements.

Title III establishes elaborate warrant requirements for wiretapping and bugging. *See* 18 U.S.C. §§ 2516, 2518 (1988). Unfortunately, Title III does not discuss television surveillance in any way. Thus, its requirements are not binding on this court in the context of video surveillance. However, the fact that Title III does not discuss television surveillance is no authority for the proposition that Congress meant to outlaw the practice.[3] Despite Congress' silence concerning video surveillance, we believe that Title III's provisions provide strong guidance for establishing video surveillance requirements. For example, Title III provides requirements for the surreptitious interception of oral communications within a private or business dwelling. We believe that the interception of oral communications provides a strong analogy to video surveillance even though video surveillance can be vastly more intrusive, as demonstrated by the surveillance in this case that recorded a person masturbating before the hidden camera.

All five of the requirements we adopt for video surveillance are found in Title III.[4]

---

3. "The motto of the Prussian state—that everything which is not permitted is forbidden—is not a helpful guide to statutory interpretation." *United States v. Torres,* 751 F.2d 875, 880 (7th Cir.1984).

4. (1) The judge issuing an order authorizing interception of wire or oral communications must find "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense."

18 U.S.C. § 2518(3)(a) (1988). (2) The judge must also find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) (1988). (3) The warrant must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c) (1988). (4) The warrant must not

These five requirements are the only requirements of Title III that deal with the probable cause and particularity requirements of the fourth amendment. We do not apply the remaining statutory provisions of Title III to video surveillance because we believe such a course to require congressional action. The provisions we do not adopt are not required by the fourth amendment. We simply look to Title III for guidance in implementing the fourth amendment in an area that Title III does not specifically cover.

Three United States circuit courts have adopted at least four of these requirements from Title III in television surveillance cases.[5] Our holding puts us into substantial agreement with these three courts. We simply articulate the additional requirement of probable cause, almost certainly assumed by all three courts.

We next look for guidance to the only congressional enactment that specifically addresses video surveillance, namely, the Foreign Intelligence Surveillance Act (FISA). *See* 50 U.S.C. §§ 1801–11 (1982). FISA establishes procedures for the electronic surveillance, including television surveillance, of foreign agents. The act applies only to the surveillance of *foreign* agents. Thus, the act does not apply to the kind of domestic surveillance that took place in this case. However, we believe that FISA provides strong guidance as to the minimum requirements for domestic surveillance. FISA was enacted in the face of the President's strong constitutional authority over foreign affairs. *See* U.S.

Const. art. II, §§ 2–3. Thus, FISA covers an area in which there is more deference to governmental searches than in the area of domestic surveillance. In light of this fact, we believe that FISA provides strong guidance for the minimum standards of domestic surveillance.

FISA contains language closely approximating four of the five requirements we have adopted. The statute requires the government submission requesting video surveillance to include: (1) "a statement of the proposed minimization procedures," 50 U.S.C. § 1804(a)(5); (2) "a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance," *id.* at § 1804(a)(6); (3) "a certification ... that such information cannot reasonably be obtained by normal investigative techniques," *id.* at § 1804(a)(7); and (4) "a statement of the period of time for which the electronic surveillance is required to be maintained," 50 U.S.C. § 1804(a)(10) (1982). "An order issued under this section may approve an electronic surveillance for the period necessary to achieve its purpose, or for ninety days, whichever is less." 50 U.S.C. § 1805(d)(1) (1982).

FISA contains requirements that are nearly identical to the ones we adopt in this case concerning domestic video surveillance. The only differences are that FISA allows ninety days while we provide for only thirty days, with the possibility of extensions, and that FISA does not require

---

allow the interception to continue "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5) (1988). (5) The warrant must require the interception to "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." *Id.*

**5.** (1) [T]he judge issuing the warrant must find that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous,' 18 U.S.C. § 2518(3)(c); (2) the warrant must contain 'a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates,' *id.*

§ 2518(4)(c); (3) the warrant must not allow the period of interception to be 'longer than is necessary to achieve the objective of the authorization, [ ]or in any event longer than thirty days' (though extensions are possible), *id.* § 2518(5); and (4) the warrant must require that the interception 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III],' *id.*

*United States v. Biasucci,* 786 F.2d 504, 510 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). *See also United States v. Torres,* 751 F.2d 875, 883–84 (7th Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985); *United States v. Cuevas–Sanchez,* 821 F.2d 248, 252 (5th Cir.1987).

a probable cause finding.[6] Thus, we find FISA's provisions supportive of the requirements we adopt in domestic video surveillance cases.

Finally, we look to Supreme Court case law for guidance in identifying the requirements for video surveillance. The Supreme Court has not specifically dealt with the constitutionality of video surveillance. However, the Court's discussions, prior to the enactment of Title III, of surreptitiously installed listening devices provides substantial guidance as to the requirements we should impose on video surveillance in the absence of congressional action. *Cf. Biasucci*, 786 F.2d at 510; *People v. Teicher*, 52 N.Y.2d 638, 422 N.E.2d 506, 514, 439 N.Y.S.2d 846, 854 (1981).

The Supreme Court found the interception of oral communications through surreptitiously installed listening devices unconstitutional in two cases predating Title III. *See Berger v. New York*, 388 U.S. 41, 59, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Berger*, the Court specifically outlined several deficiencies in a New York statute covering listening devices. In so doing, the Court condemned the absence of the five minimum requirements that we apply to video surveillance in this case. The weaknesses of the statute were: (1) "eavesdropping is authorized without requiring belief that any particular offense has been or is being committed," *Berger*, 388 U.S. at 58–59, 87 S.Ct. at 1883–84; (2) "[l]ikewise the statute's failure to describe with particularity the conversations sought gives the officer a roving commission to 'seize' any and all conversations," *id.* at 59, 87 S.Ct. at 1883; (3) The statute does not require minimization by allowing "eavesdropping for a two-month period. . . . During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime

under investigation," *id;* (4) "the statute places no termination date on the eavesdrop once the conversation sought is seized," *id.* at 59–60, 87 S.Ct. at 1883–84; and (5) the statute "permits uncontested entry without any showing of exigent circumstances," *id.* at 60, 87 S.Ct. at 1884. Thus, analogous Supreme Court precedent supports our adoption of the five requirements for domestic video surveillance.

Our adoption of the five requirements for valid domestic video surveillance leaves us with the task of applying the requirements to the facts of this case.

### A. *Probable Cause*

■ Defendants suggest that the order authorizing video surveillance in this case was not supported by probable cause because the government only alleged lawful conduct in its affidavit supporting the request for the order. Probable cause is a common-sense standard that requires facts sufficient "to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *see also Berger*, 388 U.S. at 55, 87 S.Ct. at 1881. More recently the Court has stated that "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Thus, the Supreme Court does not require that knowledge of unlawful conduct be asserted. Instead, the Court requires the judge reviewing the evidence to conclude that a substantial basis exists for the conclusion that a search would uncover evidence of wrongdoing. Our search of the record convinces us that the judge issuing the order in this case had sufficient evidence to satisfy this standard.

---

**6.** We believe that our shorter time period is justified by the high privacy considerations in domestic video surveillance. The absence of a probable cause requirement is also easily ex-

plained by the fact that FISA allows interception of foreign intelligence information which may not involve a criminal act.

The supporting affidavit alleges that the following conduct was observed. The defendants legally purchased all of the printing equipment and accessories necessary for the printing process most commonly used by counterfeiters. When making these purchases, defendants used aliases and on one occasion gave a fictitious address. There were large purchases of white bond paper similar to the weight used to print genuine United States currency. Although the defendants were purportedly setting up a printing business, they did not obtain a business permit. No telephone was located in the warehouse, and there was no sign indicating the location of the business. The window to the warehouse was covered with duct tape, and a printing press serviceman was required to wait outside when he returned to the warehouse to retrieve a tool he had left. The defendants were also observed carrying bags of trash out of the warehouse and disposing of them at defendant Stoppe's rural residence.

The affidavit was prepared by a special agent of the United States Secret Service who had extensive training in the detection and manufacture of counterfeit United States currency. The agent began his investigation based on information provided by two previously reliable confidential informants.

We hold that the above information allows a reasonable person to conclude that an offense had been or was being committed and that a search would uncover evidence of wrongdoing. Thus, we hold that probable cause existed to issue the order contested in this case.

### B. *Particularization*

The second requirement we have imposed upon video surveillance orders is particularization. The fourth amendment states that warrants shall "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The purpose of this requirement is to provide guidance to police and to avoid general searches without specific limits. *See United States v. Leary*, 846 F.2d 592, 602 (10th Cir.1988).

> Title III requires
> a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, ... a particular description of the type of communications sought to be intercepted, ... the identity of the person, if known, committing the offense and whose communications are to be intercepted.

18 U.S.C. § 2518(1)(b) (1988). Thus, particularization under Title III requires three things: (1) a description of the place to be put under surveillance; (2) a description of the type of activity sought to be intercepted; and (3) the identity of the person committing the offense. Three other cases have adopted a fourth requirement that the warrant must also particularly describe the crime under investigation. *See United States v. Cox*, 449 F.2d 679, 687 (10th Cir. 1971) (outlining all four requirements); *United States v. Tortorello*, 480 F.2d 764, 779–80 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Teicher*, 439 N.Y.S.2d at 854, 422 N.E.2d at 514. We apply all four particularity requirements to video surveillance.

The order in this case identified the place to be searched by its address and further described it as a unit in a one-story rectangular warehouse-style building. Order, March 15, 1988, at 1. We hold that this description satisfies the first particularity requirement of describing the place to be put under surveillance. The *Torres* court held that a mere address was sufficient. *See Torres*, 751 F.2d at 884. Another recent circuit case held that particularization did not require the judge issuing a warrant to approve the precise location in the house where each listening device would be placed. *See United States v. Lambert*, 771 F.2d 83, 91 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985).

The order in this case also authorized the interception of nonverbal conduct "concerning offenses involving the counterfeiting of obligations or securities of the Untied [sic]

States, or the uttering of counterfeit United States obligations or securities, in violation of Sections 471 and 472 of Title 18, United States Code." Order, March 15, 1988, at 3. We hold that this language contains an adequate description of the type of activity sought to be captured by the camera, the second requirement, and an adequate description of the crimes under investigation, the fourth requirement. Another federal court has held that language in a warrant authorizing the interception of "communications relating to the offenses of bookmaking and conspiracy" is a sufficiently particular description of the type of communication sought to be intercepted. *See United States v. Ripka,* 349 F.Supp. 539, 542 (E.D.Penn.1972), *aff'd,* 480 F.2d 918 (3d Cir.), *cert. denied,* 414 U.S. 979, 94 S.Ct. 285, 38 L.Ed.2d 223 (1973).

The third requirement of particularity requires the specific identification of individuals committing the offense under investigation. The order in this case authorized televised surveillance of "Peter Scott Stoppe, Joaquin Emilio Mesa, and others as yet unknown...." Order, March 15, 1988, at 3. We hold that this language sufficiently identifies defendants Stoppe and Mesa–Rincon. In addition, the Supreme Court has held that "the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization." *United States v. Donovan,* 429 U.S. 413, 435, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977). The particularity requirement of Title III only requires the specific identity of suspects if they are known. In addition, the Second Circuit has specifically upheld a search warrant that included the language "others yet unknown." *See United States v. Fiorella,* 468 F.2d 688, 691 (2d Cir.1972), *cert. denied,* 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974). Thus, the order in this case fulfilled the requirement of identifying the individuals to be observed.

We conclude that the order of the district court in this case satisfied the requirements of particularity.

## C. *Minimization*

The purpose of the minimization requirement is to avoid the recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera. *Teicher,* 439 N.Y.2d at 854, 422 N.E.2d at 514. "The minimization question is one of reasonableness." *United States v. Apodaca,* 820 F.2d 348, 350 (10th Cir.1987). Title III

> does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Scott v. United States,* 436 U.S. 128, 139–40, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). We hold that the order involved in this case required adequate minimization procedures.

The order required that:

> [I]nterception shall be conducted in such a manner as to minimize the interception of visual, non-verbal conduct when it is determined that a named interceptee's conduct is not criminal in nature....

> IT IS FURTHER ORDERED that when it is determined that none of the named interceptees nor any person subsequently identified as an accomplice who uses the premises to commit or converse about the designated offenses is inside the premises, interception of visual, non-verbal conduct shall be discontinued, except that if such a determination is made, visual monitoring ceases, and agents are thereafter unable to ascertain whether any of the aforementioned persons is inside the premises, agents may engage in spot monitoring to determine whether any of the persons is once again inside the premises. Whenever it is determined that any of the aforementioned persons is within the premises, interception of visual, non-verbal conduct may be initiated to determine whether such conduct involves the desig-

nated offenses. If the conduct relates to such offenses, it may be intercepted.

Order, March 15, 1988, at 4. This order specifically requires minimization and outlines the procedures to be followed. Although the sentence structure of the order concerning when visual monitoring is to stop is somewhat difficult to follow, we believe that it provides adequate guidance.

Other circuit courts have upheld very similar warrants for wiretaps or the interception of oral communications. The First Circuit explained that an order "should include a provision that the surveillance shall be conducted in such a way as to minimize the interception of extraneous communications and should specify the guidelines for accomplishing that purpose." *In re Application of the United States for an Order Authorizing the Interception of Oral Communications at the Premises Known as Calle Mayaguez 212, Hato Rey, Puerto Rico,* 723 F.2d 1022, 1027 (1st Cir.1983). The order in this case satisfied both requirements. The Eleventh Circuit has upheld a warrant where government agents monitored conversations until they determined them to be nonpertinent to the crime involved. *See United States v. Van Horn,* 789 F.2d 1492, 1502 (11th Cir.1986). The Eighth Circuit has held that the monitoring of the first two to three minutes of each conversation to determine the conversation's relevance satisfies the minimization requirement. *United States v. Losing,* 560 F.2d 906, 909 n. 1 (8th Cir.1977). The order in this case required surveillance to minimize the interception of conduct when it was determined that the conduct was not criminal in nature. The order also allowed spot checks to see if the targets of the investigation were in the building. We hold that on its face the order fulfilled the minimization requirement.

### D. *Alternative Investigation Techniques*

The fourth amendment protects us against "unreasonable searches and seizures." To determine whether a search is "reasonable" we must balance the intrusiveness of the method used and the expectation of privacy in the premises searched with the government's showing of necessity for the search. "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967). Thus, as the intrusiveness of the method used increases and the expectation of privacy in the premises searched increases, the government's showing of necessity increases and must be more clearly established.

Title III requires a search warrant application to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) (1988). In *Berger v. New York,* the Court refused to uphold a warrant statute that "permit[ted] unconsented entry without any showing of exigent circumstances." *Berger,* 388 U.S. at 60, 87 S.Ct. at 1884. "Such a showing of exigency, in order to avoid notice, would appear more important in eavesdropping [and we add in video surveillance], with [their] inherent dangers, than that required when conventional procedures of search and seizure are utilized." *Id.* We adopt these requirements in the video surveillance context by holding that the government must use the least intrusive means available to obtain the needed information.

■ The showing of necessity needed to justify the use of video surveillance is higher than the showing needed to justify other search and seizure methods, including bugging. The use of a video camera is an extraordinarily intrusive method of searching. Here, the incident in which an unidentified individual was observed masturbating provides an excellent example of this intrusiveness. No other technique would have recorded—at least in graphic visual detail—an apparently innocent individual engaging in this very personal and private behavior. "Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. [However,] [i]t is even more invasive of privacy, just as a

strip search is more invasive than a pat-down search...." *Torres*, 751 F.2d at 885. Because of the invasive nature of video surveillance, the government's showing of necessity must be very high to justify its use.

■ Another element of the intrusiveness equation that affects the government's required showing of necessity is the nature of the premises to be put under surveillance. Our expectation of privacy lessens as we move from a private home to a public business. For example, an ordinary individual has a right to expect greater privacy in his own home than does an individual owning a business into which he invites the public. The Seventh Circuit emphasized the high expectation of privacy in the home when it stated: "[M]aybe in dealing with *so* intrusive a technique as television surveillance, other methods of control as well, such as banning the technique outright from use in the home in connection with minor crimes, will be required, in order to strike a proper balance between public safety and personal privacy." *Torres*, 751 F.2d at 882.

■ The business involved in this case falls somewhere between a private home, in which there is a high expectation of privacy, and a public business, in which there is a lower expectation of privacy. This business was not a home. There were no bedroom or living areas. We think that it is fair to say that the government reasonably did not expect someone to masturbate in the building. However, the business was not open to the general public. The windows had been taped over and no signs invited public traffic. We conclude that the expectation of privacy was less than in a private home, but higher than in a public business. We also conclude that the use of a highly intrusive video camera in a building in which there was at least a "medium" expectation of privacy created a high degree of intrusiveness. Consequently, the government had a high burden to meet in showing the necessity of video surveillance.

In the affidavit supporting the application for a video surveillance order, the government outlined the general surveillance techniques that had been used without success. "The U.S. Secret Service has exhausted all investigative leads, and ... there is a possibility when Stoppe and Mesa counterfeit money it could be done without detection with the current surveillance techniques." Affidavit, March 15, 1988, at 27. The affidavit also explained that two other techniques would not work in this case. "An audio intercept has also not been requested and this is based on my experience that Stoppe and Mesa could counterfeit U.S. currency without discussing the process to each other, and it is not practical since the noise of the printing press could drown out any type of audio intercept." *Id.* at 20. "The U.S. Secret Service has been unable to develop an inside confidential informant in this case." *Id.*

The application for the order also described three types of information necessary for the conviction of defendants that only video surveillance could provide:

    a. information indicating the precise nature, scope, extent, and methods of operation of the participants in the illegal activities referred to above;

    b. information reflecting the identities and roles of all accomplices, aiders and abettors, co-conspirators and participants in the illegal activities referred to above; and

    c. admissible evidence of commission of the offenses described above.

Application, March 15, 1988, at 2–3. This information formed the government's showing of necessity.

This court has previously held that the provisions of Title III "are not designed to force the government to exhaust all other conceivable investigative procedures before resorting to wiretapping." *Apodaca*, 820 F.2d at 350. In addition, this court has previously used the identification of all of the members of a conspiracy, learning the precise nature and scope of the illegal activity, the apprehension of accomplices, and the determination of the dimensions of an extensive conspiracy as sufficient justification for the use of electronic surveillance. *See United States v. Newman*, 733 F.2d

1395, 1399 (10th Cir.1984); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981). Thus, our prior, nonvideo surveillance cases strongly support the order issued in this case.

In another television surveillance case, the Second Circuit held that an affidavit, describing the techniques that had been attempted and those that the government did not consider worth pursuing, sufficiently demonstrated that video surveillance was necessary. *See Biasucci*, 786 F.2d at 511. This holding was contrasted with a prior case in which the Second Circuit held that the government had failed to establish that other investigative procedures were unlikely to succeed when it merely asserted that no other investigative method existed to determine the identity of individuals who might be involved in drug transactions. *See id.* (referring to *United States v. Lilla*, 699 F.2d 99 (2d Cir.1983)). If we follow the only other circuit case fully discussing the alternative investigatory techniques requirement, we should uphold the order in this case because the government's affidavit described the techniques that had been attempted and two techniques that the government did not consider worth pursuing. This showing satisfied both the need to set forth methods tried and the exhaustion of reasonable alternative investigation methods.

We do not require the government to explain why all conceivable investigatory methods would not work. *See Apodaca*, 820 F.2d at 350. Instead, we require the government to prove exhaustion—either by attempt or explanation of why the method would not work—of all "reasonable" investigatory methods. We will find authorization of video surveillance improper only when the government fails to attempt or explain its failure to attempt *all* reasonable alternative investigatory techniques. The determination of reasonableness will be based on the individual facts of each case.

Although existing case law seems to support the order in this case, we believe that the highly intrusive nature of a video camera requires further analysis to determine whether any less intrusive means could reasonably have been used. *See Teicher*, 439 N.Y.S.2d at 855, 422 N.E.2d at 515. The legislative history of Title III suggests a few other techniques that should be considered. "Normal investigative procedure would include, for example, standard visual or aural surveillance ... general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." S.Rep. No. 1097, 90th Cong., 2d Sess. 101 (1968).

With respect to standard visual or aural surveillance, the government's affidavit specifically explains that defendants could counterfeit money without detection using current visual surveillance techniques. *See* Affidavit, March 15, 1988, at 27. The government also explained that an audio intercept was not requested because money could be counterfeited without verbal discussion and the printing presses could drown out any type of audio intercept. *See id.* at 20. It seems likely, however, that use of standard visual surveillance of the business would disclose the identities of most accomplices. Nevertheless, as the government points out, at least two of its goals from video surveillance could not be achieved through standard visual or audio surveillance.

It is possible that interrogation of one of the suspects under a grant of immunity would have been a fruitful course. However, only two suspects were involved in the case; and the government was unsure of the role of either party. The process of arrest or grand jury subpoena could have raised suspicion in others likely to prevent successful completion of the investigation. Although the government did not discuss this option in its affidavit, we do not believe that interrogation under a grant of immunity would have been a reasonable alternative in this case. Government explanation of the unreasonableness of this alternative would have been helpful in this case. Yet, we do not strictly require the government to discuss its reasons for rejecting alternatives that appear unreasonable under a recitation of the facts of the case.

The government also did not specifically discuss why a standard search of the premises was not practical. Again, we only require the government to discuss reasonable alternatives. While a normal search could have produced some circumstantial evidence, it is also quite likely that the key evidence of actual counterfeit bills might not be found. If the Secret Service had searched the business before any money was counterfeited, they would have obtained no direct evidence of the counterfeiting operation.

Regarding infiltration, it would be very difficult for an agent to penetrate an operation involving only two people without arousing great suspicion. The government's affidavit specifically explained that the Secret Service had been unable to develop an inside confidential informant in this case. *See* Affidavit, March 15, 1988, at 20.

We conclude that the government made the necessary showing that other investigative techniques had or would have failed. The government's affidavit specifically explains several investigative techniques that were tried but failed prior to the request for video surveillance. We have also concluded that the alternatives suggested by the legislative history of Title III were not reasonable alternatives in this case. As a result, the government has shown a strong need for video surveillance.

In summary, this case involves a situation in which the government has demonstrated a pressing need for video surveillance, and we have determined that the resulting search would involve a high degree of intrusiveness. To determine the reasonableness of this search we are required to balance the government's showing of need with the intrusiveness of the search. Thus, although we find video surveillance extremely intrusive, we hold that the expectation of privacy in this business premises was low enough as to be outweighed by the government's specific showing of a need for *video* surveillance.

Our holding is narrowly limited to business premises. We leave to another day the details of the higher showing that would *a fortiori* be required to justify video surveillance of the central bastion of privacy—the home. We agree with the sentiments expressed by the Seventh Circuit in *Torres*.

[M]aybe in dealing with *so* intrusive a technique as television surveillance, other methods of control as well, such as banning the technique outright from use in the home in connection with minor crimes, will be required, in order to strike a proper balance between public safety and personal privacy.... That question is not before us, but we mention it to make clear that in declining to hold television surveillance unconstitutional per se we do not suggest that the Constitution must be interpreted to allow it to be used as generally as less intrusive techniques can be used.

*Torres,* 751 F.2d at 882–83.

### E. *Time Limitations on Video Surveillance*

■ Title III does not allow electronic surveillance "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5) (1988). The order authorizing video surveillance in this case stated that surveillance was to continue until three types of conduct were intercepted or for a period of thirty days from the date of the order, whichever was earlier. Thus, the order fully complied with the time requirements that would apply to audio surveillance under Title III. Although video surveillance is more intrusive than the methods allowed under Title III, we see no reason to add additional time restraints on video surveillance. Therefore, we hold that the order in this case satisfied proper time limitations.

In conclusion, we hold that the order issued by the district court in this case complied with all the requirements necessary to make the search a reasonable one under the fourth amendment.

### V. Sentencing Guidelines

Defendant Stoppe challenges his sentence on the ground that the district court

erred in failing to depart downward from the United States Sentencing Guidelines. Mr. Stoppe claims that he rendered substantial assistance to the government in the prosecution of his accomplice, defendant Mesa–Rincon. Mr. Stoppe concludes that this assistance entitles him to a reduction in his sentence from that mandated by the guidelines based on United States Sentencing Commission, *Guidelines Manual*, § 5K1.1 (Nov.1989). Mr. Stoppe further alleges that the government agreed to move for a reduction under section 5K1.1 under a plea agreement and the government violated this agreement by failing to make such a motion.

■ We hold that the government had no obligation to follow the first plea bargain because it was obtained by false pretenses. The record on appeal contains several references to certain false statements made by defendant Stoppe prior to the first plea bargain. In those statements, Mr. Stoppe represented that a third party was involved in the crime and had possession of some of the counterfeit currency. Record, vol. 2, at 8–10, 18. Most important, however, is the fact that the record before us clearly indicates that defendant Stoppe admitted that he lied to the government prior to the first plea bargain. Record, vol. 2, at 9–10, 15, 18. We agree with defendant Stoppe's assertion that plea bargains are governed by contract principles. What Mr. Stoppe fails to recognize, however, is that contracts entered under fraudulent circumstances are voidable by the injured party. The government, here the injured party to the contract, clearly voided this contract immediately upon hearing that Mr. Stoppe's statements were false. Accordingly, we hold that the government was under no obligation to move for a reduction outside the sentencing guidelines by virtue of the first plea agreement.

■ We next address the issue of whether defendant Stoppe's assistance in the prosecution of defendant Mesa–Rincon required the government to move for a downward sentence departure regardless of the validity of the first plea agreement. The language of the sentencing guidelines is clear. The district court has no power to order a downward departure based on substantial assistance absent a motion by the government. *"Upon motion of the government* stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1 (emphasis added). *See also United States v. Bruno*, 897 F.2d 691, 695 (3d Cir.1990); *United States v. Alamin*, 895 F.2d 1335, 1337 (11th Cir.1990); *United States v. Huerta*, 878 F.2d 89, 91 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 845, 107 L.Ed.2d 839 (1990); *United States v. Ayarza*, 874 F.2d 647, 653 (9th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990). The application notes to section 5K1.1 make clear that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain." U.S.S.G. § 5K1.1, comment. (n.3). In this case the government has clearly indicated its belief that defendant Stoppe's assistance in the prosecution of defendant Mesa–Rincon was not sufficient to warrant a downward departure. Giving the government's position substantial weight, as the guidelines require, we hold that defendant Stoppe's assistance in the prosecution of defendant Mesa–Rincon did not provide adequate grounds to require a departure downward from the guidelines. Thus, the government was not required to move for a downward departure.

## VI. Conclusion

We hold that the district court has power to authorize covert television surveillance. We also hold that the district court's order authorizing video surveillance in this case complied with all the requirements we now impose on video surveillance. Finally, we hold that defendant Stoppe was not entitled to a downward departure from the sentencing guidelines.

The district court's disposition of this case is AFFIRMED.