F I L E D
United States Court of Appeals
Tenth Circuit

JUN 30 1997

PATRICK FISHER
Clerk

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

BRYAN LEE KILLINGSWORTH,

      Defendant - Appellant.

No. 96-6021

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-95-58-L)**

**Submitted on the briefs:**[*]

William P. Early, Assistant Federal Public Defender, Oklahoma City, OK, for the appellant.

Patrick M. Ryan, United States Attorney, Leslie M. Maye, Assistant United States Attorney, Oklahoma City, OK, for the appellee.

Before **BRORBY, HOLLOWAY,** and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case therefore is ordered submitted without oral argument.

Defendant-Appellant Bryan Lee Killingsworth ("Killingsworth") appeals the denial of his motion to withdraw a guilty plea, and the denial of his motion to suppress certain evidence obtained through a telephone wiretap. Because we believe there was an adequate factual basis to support a finding of Killingsworth's guilt, and because we believe the government complied with the pertinent provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510-22 (1994 & Supp. 1996), we affirm.

**BACKGROUND**

On May 19, 1995, a grand jury in the Western District of Oklahoma returned a 19-count indictment charging various drug and weapon offenses against Killingsworth and his co-defendant, Patrick Hackbert. Killingsworth was named in fifteen of the substantive counts and in a forfeiture count. The two counts relevant to this appeal are: Count One, under which Killingsworth was charged with conspiracy to possess with intent to distribute methylenedioxymethamphetamine ("ecstasy"), methamphetamine, and cocaine (powder) in violation of 21 U.S.C. § 846 (1994); and Count Nineteen, under which Killingsworth was charged with using or carrying a firearm in connection with a drug offense in violation of 18 U.S.C. §924(c) (1994).

The indictments against Killingsworth were returned on May 18, 1995, after a lengthy investigation into the "Bustos Organization," a drug distribution ring operated out of Oklahoma City. The investigation was coordinated by the FBI and the Oklahoma City, Oklahoma, police. Much of the incriminating information regarding Killingsworth was gathered through wiretap surveillance of two telephone lines subscribed to by Steve Schardein and Jill Knight, two suspected members of the Bustos Organization. The wiretap was authorized by an Order issued by Judge Alley on February 17, 1995, pursuant to 18 U.S.C. § 2518 (1994).

Killingsworth moved to suppress the evidence gathered through the wiretap interceptions. In his motion, Killingsworth claimed that: (1) the government failed to show necessity for the surveillance; (2) the wiretap interceptions were not conducted in conformity with the authorization order; and (3) the authorization order was insufficient on its face because Killingsworth was not named as a target in the wiretap application.

In an order dated October 6, 1995, the district court denied Killingsworth's motion to suppress. Based on Agent Lotspeich's affidavit, the court concluded that the government had established that the wiretap was necessary. Specifically, the court noted that the Bustos Organization was comprised largely of family members and close friends, and thus had proven difficult to infiltrate; that

previous efforts at investigation, including infiltration, interviews with organization members, pen registers, and visual surveillance, had proven unsuccessful; and that confidential sources had not been forthcoming due to fear for their personal safety. Additionally, the court rejected Killingsworth's minimization and identification arguments, noting that Judge Alley's authorization order had specifically included "others as yet unknown" who were involved in the Bustos Organization, and that the officers did not know that Killingsworth was not one of the persons named in the authorization order when they recorded his incriminating conversations.

On October 17, 1995, Killingsworth pled guilty to Counts One and Nineteen. As part of his plea agreement, the other charges were dismissed, and Killingsworth's plea was conditioned under Fed. R. Crim. P. 11(a)(2) upon his right to appeal the denial of his suppression motion.

On December 6, 1995, the Supreme Court decided Bailey v. United States, 116 S. Ct. 501 (1995). In Bailey, the Court held that a person may not be convicted of having "used" a firearm in connection with a drug offence in violation of 18 U.S.C. § 924(c) unless he "actively employed the firearm during and in relation to the predicate crime." Id. at 509. Bailey effectively overruled prior Tenth Circuit precedent, under which a § 924(c) "use" conviction could be based on evidence showing that the defendant merely had access to a firearm. See

United States v. Hager, 969 F.2d 883, 888-89 (10th Cir.), cert. denied, 506 U.S. 964 (1992). Based on Bailey, Killingsworth filed a pre-sentence motion to withdraw his guilty plea to Count Nineteen pursuant to what is now codified as Fed. R. Crim. P. 32(e), claiming that there was no longer a factual basis supporting a finding of guilty on the § 924(c) charge.

The district court denied Killingsworth's motion, reasoning that there was sufficient evidence that Killingsworth had used his gun in connection with his drug offenses, both by displaying it while transactions took place and by employing it to intimidate people into paying their debts for drugs purchased from him. Killingsworth was then sentenced to sixty months confinement on Count One and to sixty months confinement on Count 19, to run consecutively.

Killingsworth now appeals both the denial of his motion to withdraw his guilty plea and the denial of his motion to suppress.

## Discussion

### A. Motion to Withdraw the Plea

Fed. R. Crim. P. 32(e) provides that "[i]f a motion to withdraw a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." The defendant bears the burden of showing that a denial of a motion to withdraw

a plea was not "fair and just," United States v. Gordon, 4 F.3d 1567, 1572 (10th Cir. 1993), cert. denied, 510 U.S. 1184 (1994), and we review the denial of such a motion for an abuse of discretion. United States v. Guthrie, 64 F.3d 1510, 1513 (10th Cir. 1995).

In Gordon, we outlined seven factors that courts should consider in determining whether the defendant has shown a fair and just reason for allowing withdrawal of a guilty plea: (1) whether the defendant has asserted innocence; (2) prejudice to the government if the motion is granted; (3) whether the defendant has delayed filing the motion to withdraw his plea; (4) inconvenience to the court if the motion is granted; (5) the quality of the defendant's assistance of counsel during the plea; (6) whether the plea was knowing and voluntary; and (7) the waste of judicial resources. Gordon, 4 F.3d at 1572.

Killingsworth's argument that there is no longer a factual basis for his conviction under § 924(c) goes to the first factor we consider under Gordon, that is, whether the defendant claims to be innocent. We note that Killingsworth does not dispute the government's version of the facts; he merely disputes whether those facts can give rise to a conviction under § 924(c).

We believe that Killingsworth is simply incorrect in asserting that there was no factual basis for his guilt under Bailey. As the district court discussed in its order, testimony of witness Marla Black indicated that Killingsworth kept the gun

- 6 -

on display in his bedroom during drug transactions that were conducted there. [1]

Additionally, both co-defendant Hackbert and witness Black told Agent Lotspeich that Killingsworth used the gun to intimidate individuals who owed him money from prior drug transactions.

In Bailey, the Court explained that a defendant "uses" a firearm within the meaning of 18 U.S.C. § 924(c) when the defendant "has a gun on display during a transaction." 116 S.Ct. at 507. The Bailey Court also stated that "'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 508. Thus, Killingsworth's claim that there was not a factual basis to convict him under Bailey is simply false.

Accordingly, we hold that the district court did not abuse its discretion in denying Killingsworth's motion to withdraw his guilty plea. Because the change in the law effected by Bailey simply does not bear on Killingsworth's factual guilt or innocence, Killingsworth simply did not satisfy his burden of showing that a

---

[1] This testimony was given at Hackbert's sentencing hearing. The district court took judicial notice of that testimony, relying on cases allowing sentencing courts to take judicial notice of information that has "sufficient indicia of reliability to support its probable accuracy," United States v. Davis, 912 F.2d 1210, 1214 (10th Cir. 1990), and cases allowing courts to take judicial notice of its own records, United States v Valencia, 44 F.3d 269, 273 n.3 (5th Cir. 1995); United States v. Estep, 760 F.2d 1060, 1063 (10th Cir. 1985). (See D.Ct. Order 1/5/96, at 3). Killingsworth does not object to the court's taking judicial notice of this testimony.

withdrawal of his guilty plea would be fair and just.    See Guthrie , 64 F.3d at

1513.[2]


B.    **Motion to Suppress**

Killingsworth also contends that the evidence against him should be

suppressed due to various alleged violations of the wiretapping statute, Title III of

the Omnibus Crime Control and Safe Streets Act of 1968, as amended. 18 U.S.C.

§§ 2510-22 (1994 & Supp. 1996) ("Title III").  Section 2515 of Title III provides

that evidence derived from a wiretap shall be suppressed if that evidence was

obtained unlawfully. 18 U.S.C. § 2515 (1994).

Among other provisions, Title III requires the government to make a full

and complete showing that a wiretap is necessary.    See Id. §§ 2518(1)(c),

2518(3)(c).  It also requires that authorization orders include the identity, if

_____

[2] It appears that Killingsworth also argued below that the government would not be prejudiced by the withdrawal of his guilty plea.  We disagree.  The government dismissed the other counts against Killingsworth in accepting Killingsworth's plea agreement.  Thus, if the plea were withdrawn and the government is not permitted to return to the pre-plea agreement status, the government would be forced either to obtain a new indictment on those counts or forego their prosecution.  Finally, the defendant did not attempt to prove any of the other Gordon factors below and thus we will not review them here.  See Sac & Fox Nation v. Hanson, 47 F.3d 1061, 1063 (10th Cir.), cert. denied, 116 S. Ct. 57 (1995) (explaining that we will not consider an issue on appeal that was not raised below, except for the most manifest error or where the issue of sovereign immunity or jurisdiction is raised).

known, of persons subject to the wiretap, id. § 2518(1)(b)(iv), and that the interception of communications be minimized, id. § 2518(5).

Under what is known as the "necessity requirement," an application for wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) (1994). The judge issuing an authorization order then must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) (1994). We have explained that the purpose of the necessity requirement "is to ensure that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995), cert. denied, 116 S.Ct. 2497 (1996) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)).

In United States v. Mesa-Rincon, 911 F.2d 1433 (10th Cir. 1990), the legislative history of Title III was consulted for examples of the types of investigative procedures that should be considered by the government as a matter of first resort; namely: "' . . .standard visual or aural surveillance[,] . . . general questioning or interrogation under an immunity grant, use of regular search

- 9 -

warrants, and the infiltration of conspiratorial groups by undercover agents or informants.'" Id. at 1444 (quoting S. Rep. No. 90-1097, at [79] (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190). [3] We elaborated upon the investigative procedures that must be considered before resort is made to wiretapping in United States v. Castillo-Garcia, No. 96-1259, (10th Cir. June 30, 1997). There, we said,

> We now expressly hold what the court in Mesa-Rincon suggested and what seems clearly to be contemplated by Title III. To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous. We add pen registers and trap and trace devices to this list because they possess a logical

---

[3] Although Mesa-Rincon involved visual, rather than aural, electronic surveillance, the Mesa-Rincon court adopted a "necessity" requirement for the government's use of clandestine television cameras by analogizing to the very provisions of Title III at issue here. See Mesa-Rincon, 911 F.2d at 1442-43. The Mesa-Rincon court predicated its analysis primarily on case law pertaining to wiretapping, and on the same legislative history materials applicable to the present case. See id. at 1442-45.

relationship and close affinity to wiretaps and yet are less intrusive. Thus, unless the government can show that they would be ineffective or dangerous they must be tried before resorting to wiretaps.

Whether other normal investigative techniques must also be explored before turning to wiretaps will depend on the unique circumstances of each investigation. For example, it will often be the case that the government must consider first the less intrusive technique of reviewing available public, private, or governmental records pertaining to the suspects under investigation to see if the requisite information needed to prosecute may be obtained in that way.

Id., slip op. at 15-16.

Finally, a district court's wiretap authorization order is presumed proper, and the defendant bears the burden of overcoming this presumption. United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir.), cert. denied, 493 U.S. 981 (1989). We review *de novo* whether the necessity requirement was met. United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995).

With these guidelines in mind, we believe that both the government's wiretap application and the district court's authorization order adequately complied with Title III because the wiretap application detailed that normal investigative techniques had been attempted with regard to the Bustos Organization and it explained why those techniques had been unsuccessful. (Application, ¶¶ 66-80).

Standard Visual or Aural Surveillance

In its wiretap application, the government explained that visual surveillance had been attempted, but that it had proven unsuccessful because of the government's difficulty in determining from surveillance whether the purpose of a monitored meeting was for legitimate or criminal purposes. (Application, ¶ 70). The application explained that such a determination was especially difficult with regard to the Bustos Organization because the core of the organization was "related by blood and/or marriage." (    Id.)

General Questioning or Interrogation Under an Immunity Grant

The wiretap application revealed that the government had attempted interviews with subjects but that information gained from those interviews proved insufficient to "identify all persons involved in the conspiracy, the source of the drugs, its manner of financing, or the investment and use of drug proceed." (¶ 66). One particular subject, Jose Cruz-Bustos, offered to cooperate with law enforcement concerning the investigation but failed to provide any information concerning his brother and other family members. (¶ 68). The application also explained that further interviews would prove unsuccessful because the family members at upper echelon of the Bustos Organization were unlikely to turn on each other. Finally, the application explained that further interviews would

compromise the investigation by alerting the Bustos organization to that investigation. (¶ 69).

In addition, the application discussed the possibility of instigating a grand jury investigation and an assistant United States Attorney concluded that would not be an appropriate investigative tool because the subjects of the investigation would most likely invoke the Fifth Amendment, it would be unwise to grant immunity because it might preclude prosecution of the most culpable persons, and that it would alert the conspirators of the investigation, which would jeopardize both the on-going investigation and the lives of informants and undercover officers. (¶79).

Search Warrants

The government explained in its wiretap application that search warrants had not been used because documentary records of the drug distribution conspiracy appeared to be sparse, and thus a search warrant would not reveal the kind of evidence needed to prove that certain family members participated in the conspiracy. (¶ 75). Further, the application explained that the execution of search warrants would notify the principals of the existence of the ongoing investigation. ( Id.).

Infiltration by Undercover Agents or Informants.

The government disclosed in its wiretap application that it was currently using an undercover agent as part of its investigation, but that this agent had been unsuccessful in reaching the high levels of the organization. (¶ 76). The government also disclosed that it had used confidential informants to make illegal drug purchases, but explained that these informants were unwilling to testify, and at any rate, had little information concerning the major participants in the organization. (¶ 78).

Other Techniques

The government also explained that its use of pen registers and long distance toll records had not provided sufficient evidence with regard to the Bustos Organization because such methods were incapable of determining which individuals actually made and received the monitored calls, nor could the methods ascertain the nature of the calls. (¶ 72).

Finally, the government detailed how it had used public, private, and governmental records as part of its investigation. Specifically, the government obtained records from Southwestern Bell Telephone Company to determine that subscribers to certain telephone were suspected members of the Bustos Organization. (¶¶ 15, 17, 18, and 34). The government also analyzed phone records to determine that the length of phone calls made by suspected members of

the Bustos Organization indicated that calls were being made to digital pagers and thus suggestive of large-scale drug trafficking. (¶ 24).  Further, the government obtained the criminal background of the intended interceptees, (¶ 26) and relied upon Oklahoma City Police Department crime, investigative, and arrest reports to further its investigation. (¶¶ 50, 51, 58, 59, 62, 63, and 65).  However, none of these investigatory techniques provided the government with sufficient information to complete its investigation.

We believe that the government's explanations in its application comprise "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c) (1994).  Thus, the district court did not err in finding that the government had satisfied the "necessity requirement" with regard to the wiretap at issue.      See 18 U.S.C. § 2518(3)(c) (1994).   Compare  Castillo-Garcia  , No. 96-1259 (granting suppression with respect to evidence obtained through certain wiretaps where the government failed to meet the "necessity requirement").

The district court was also correct in rejecting Killingsworth's claim that the authorization was converted into an impermissible "general warrant" by allowing the recording of conversations among "others not yet known."  The wiretap statute only requires that an application for a wiretap include "the identity

of the person,  if known , committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv) (1994) (emphasis added).  Likewise, the district court's authorization order must specify "the identity of the person,  if known , whose communications are to be intercepted."  Id. § 2518(4)(a) (emphasis added).  As the Supreme Court has recognized, "[t]he clear implication of this language is that when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute."  United States v. Kahn , 415 U.S. 143, 157 (1974). [4]  Thus, the mere fact that neither the wiretap application nor the authorization order mentioned Killingsworth by name does not render the interception of communications to which Killingsworth was a party unlawful.

Finally, the district court properly rejected Killingsworth's claim that the wiretap evidence should be suppressed because the law enforcement officers allegedly did not minimize the communications intercepted and recorded pursuant to section 2518(5).  That section requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to

_____

   [4] In addition to holding that the wiretapping statute only requires an application to name known persons who are subject to a wiretap, the Court in Kahn also recognized that the failure to name all persons subject to a wiretap does not render the wiretap unconstitutional.  415 U.S. at 154-55 & n.15.

- 16 -

interception under this chapter . . . ."  18 U.S.C. § 2518(5) (1994).  The Supreme Court has held that this provision does not create an "inflexible rule of law," but rather demands an evaluation of the "facts and circumstances of each case."  Scott v. United States , 436 U.S. 128, 139-40 (1978).

The Court in  Scott  considered several "factors" in determining that the law enforcement officers properly minimized interceptions in that case.  Id. at 140-41 Several of these factors are instructive here.  First, the Court emphasized the importance of considering the "circumstances of the wiretap" at issue rather than the absolute percentage of irrelevant calls intercepted.  Id. at 140.  Next, the Court stated that "more widespread surveillance" is justified when the wiretap is targeted towards what is thought to be a widespread conspiracy.  Id.  Finally, the Court noted that officers should be given some leeway at the early stages of investigation where it is difficult to determine which calls are relevant and which are irrelevant.  Id. at 141.

In the present case, Killingsworth contends that the officers should have ceased recording once they realized that the persons involved in the conversations were neither Schardein nor Knight, the two people named in the application and the authorization order.  For several reasons, Killingsworth's argument runs counter to the flexible approach mandated by the Supreme Court in  Scott .

First, Killingsworth does not dispute that the intercepted communications were drug-related (see D. Ct. Order 8/6/95 at 7, uncontested in Killingsworth's brief) and thus not precluded by the minimization requirements See 18 U.S.C. § 2518(5) (requiring that wiretaps "be conducted in such a way as to minimize the interception of communications *not otherwise subject to interception* . . . .") (emphasis added). The district court's wiretap order clearly, and properly, permitted interceptions of overheard conversations between unlisted parties during the course of an otherwise valid wiretap intercept if "it is determined during the portions of the conversations already overheard that the conversation is criminal in nature." (D.Ct. Order, at 6).

Second, the intercepted calls to which Killingsworth was a party were authorized by the order. The authorization order specifically stated that "'[i]nterception must be suspended immediately when it is determine [ *sic* ] . . . that none of the named interceptees or any of their confederates , when identified, are participants in the conversation.'" D. Ct. Order 8/6/95 at 6 (quoting authorization order). It is undisputed that Killingsworth was a confederate of Schardein and Knight, and was viewed as such by the officers recording the conversation. Thus, the minimization requirements were satisfied.

Finally, assuming *arguendo* that the conversations at issue were not within the scope of the authorization order, the circumstances in which those calls were

intercepted were such that a liberal approach to minimization is appropriate. See Scott, 436 U.S. at 140 (requiring courts to look to circumstances of interception in determining how much minimization is appropriate). Minimization does not require perfection in differentiating between innocent and criminal conversations. The investigation at issue here concerned a suspected widespread drug conspiracy, and thus "more extensive surveillance" was justified. Id. Further, the conversations at issue were intercepted during the early stages of the investigation, when the officers had not yet identified the voices of the persons named in the authorization order and had not yet determined the scope of the Bustos Organization. More deference is owed with regard to such interceptions because it is difficult for investigating officers to determine which conversations are pertinent and which are impertinent early in an investigation. Id. at 141.

Accordingly, we believe the wiretap authorization in this case was neither invalid nor violated by the investigating officers. Therefore, we affirm the district court's refusal to suppress the evidence against Killingsworth obtained by wiretap interception.

**CONCLUSION**

Because we believe the investigating officers complied with the pertinent provisions of the wiretapping statute, 18 U.S.C. § 2518 (1994), and because we

- 19 -

believe that, notwithstanding Bailey v. United States, 116 S.Ct. 501 (1995), there was sufficient factual basis for a finding of Killingsworth's guilt under 18 U.S.C. § 924(c) (1994), we AFFIRM the district court's denials of both Killingsworth's motion to suppress, and his motion to withdraw his guilty plea.