DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**ROBERT KRAFT,**
Appellee.

No. 4D19-1499

_____

**STATE OF FLORIDA,**
Appellant,

v.

**ROBERT FREELS,** et al,
Appellees.

Nos. 4D19-1655, 4D19-1656, 4D19-1657, 4D19-1658, 4D19-1659,
4D19-1660, 4D19-1661, 4D19-1662, 4D19-1663, 4D19-1664, 4D19-
1665, 4D19-1666, 4D19-1667, 4D19-1668, 4D19-1669, 4D19-1670,
4D19-1671, 4D19-1672, 4D19-1673, 4D19-1674, 4D19-1675, 4D19-
1676, 4D19-1677, 4D19-1678, 4D19-1679, 4D19-1680, 4D19-1681,
4D19-1682, 4D19-1683, 4D19-1684, 4D19-1685, 4D19-1686, 4D19-
1687, 4D19-1688, 4D19-1689, 4D19-1690, 4D19-1691, 4D19-1692,
4D19-1693, 4D19-1694, 4D19-1695, 4D19-1696, 4D19-1697, 4D19-
1698, 4D19-1699, 4D19-1700, 4D19-1701, 4D19-1702, 4D19-1703,
4D19-1704, 4D19-1705, 4D19-1706, 4D19-1707, 4D19-1708, 4D19-
1709, 4D19-1710, 4D19-1711, 4D19-1712, 4D19-1713, 4D19-1714,
4D19-1715, 4D19-1716, 4D19-1717, 4D19-1718, 4D19-1719, 4D19-
1732, 4D19-1733, 4D19-1734,4D19-1735, 4D19-1736, 4D19-1737,
4D19-1738, 4D19-1739, 4D19-1740, 4D19-1741, 4D19-1742, 4D19-
1743, 4D19-1744, 4D19-1745, 4D19-1746, 4D19-1747, 4D19-1748,
4D19-1749, 4D19-1750, 4D19-1751, 4D19-1752, 4D19-1753, 4D19-
1754, 4D19-1755, 4D19-1756, 4D19-1757, 4D19-1758, 4D19-1759,
4D19-1760, 4D19-1761, 4D19-1762, 4D19-1763, 4D19-1764, 4D19-
1765, 4D19-1766, 4D19-1767, 4D19-1768, 4D19-1769, 4D19-1770,
4D19-1771, 4D19-1772, 4D19-1773, 4D19-1774, 4D19-1775, 4D19-
1776, 4D19-1777, 4D19-1778, 4D19-1779, 4D19-1780, 4D19-1781,

4D19-1782, 4D19-1783, 4D19-1784, 4D19-1785, 4D19-1803, 4D19-1804, 4D19-1805, 4D19-1806, 4D19-1807, 4D19-1808, and 4D19-1809

---

**STATE OF FLORIDA,**
Appellant,

v.

**HUA ZHANG, LEI WANG, LEI CHEN,** and **SHEN MINGBI**
Appellees.

No. 4D19-2024

[August 19, 2020]

Consolidated appeals and cross-appeals of nonfinal orders from the County Court for the Fifteenth Judicial Circuit, Palm Beach County; Leonard Hanser, Judge; L.T. Case Nos. 50-2019-MM-002346-AXXX-NB and 50-2019-AP-000074-AXXX-MB; the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Joseph G. Marx, Judge; L.T. Case Nos. 50-2019-CF-001606-AXX-MB, 50-2019-CF-001606-BXX-MB, 50-2019-CF-001606-CXX-MB, and 50-2019-CF-001606-DXX-MB; and the County Court for the Nineteenth Judicial Circuit, Indian River County; David C. Morgan and Nicole P. Menz, Judges; L.T. Case Nos. 312019MM000328A, 312019MM000330A, 312019MM000333A, 312019MM000334A, 312019MM000335A, 312019MM000336A, 312019MM000337A, 312019MM000338A, 312019MM000339A, 312019MM000340A, 312019MM000342A, 312019MM000343A, 312019MM000345A, 312019MM000347A, 312019MM000348A, 312019MM000350A, 312019MM000352A, 312019MM000353A, 312019MM000354A, 312019MM000355A, 312019MM000357A, 312019MM000358A, 312019MM000359A, 312019MM000361A, 312019MM000363A, 312019MM000365A, 312019MM000366A, 312019MM000367A, 312019MM000368A, 312019MM000369A, 312019MM000371A, 312019MM000372A, 312019MM000373A, 312019MM000376A, 312019MM000378A, 312019MM000379A, 312019MM000383A, 312019MM000384A, 312019MM000385A, 312019MM000387A, 312019MM000389A, 312019MM000391A, 312019MM000392A, 312019MM000393A, 312019MM000394A, 312019MM000395A, 312019MM000397A, 312019MM000398A, 312019MM000399A, 312019MM000400A, 312019MM000402A, 312019MM000404A, 312019MM000405A, 312019MM000406A,

312019MM000407A, 312019MM000409A, 312019MM000410A, 312019MM000411A, 312019MM000412A, 312019MM000413A, 312019MM000415A, 312019MM000417A, 312019MM000419A, 312019MM000420A, 312019MM000421A, 312019MM000422A, 312019MM000424A, 312019MM000426A, 312019MM000428A, 312019MM000432A, 312019MM000433A, 312019MM000434A, 312019MM000435A, 312019MM000436A, 312019MM000438A, 312019MM000440A, 312019MM000441A, 312019MM000442A, 312019MM000443A, 312019MM000445A, 312019MM000446A, 312019MM000447A, 312019MM000449A, 312019MM000450A, 312019MM000451A, 312019MM000452A, 312019MM000453A, 312019MM000454A, 312019MM000455A, 312019MM000456A, 312019MM000458A, 312019MM000459A, 312019MM000461A, 312019MM000462A, 312019MM000463A, 312019MM000465A, 312019MM000466A, 312019MM000470A, 312019MM000471A, 312019MM000474A, 312019MM000475A, 312019MM000476A, 312019MM000477A, 312019MM000478A, 312019MM000480A, 312019MM000481A, 312019MM000483A, 312019MM000484A, 312019MM000490A, 312019MM000491A, 312019MM000492A, 312019MM000493A, 312019MM000495A, 312019MM000496A, 312019MM000497A, 312019MM000502A, 312019MM000554A, 312019MM000556A, 312019MM000560A, 312019MM000561A, 312019MM000562A, 312019MM000572A, 312019MM000587A, 312019MM000588A, 312019MM000591A, and 312019MM000668A.

Ashley Moody, Attorney General, Amit Agarwal, Solicitor General, and Jeffrey Paul DeSousa, Deputy Solicitor General, Tallahassee, for appellant.

Derek L. Shaffer, William A. Burck, and Sandra Moser of Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., and Alex Spiro of Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Pro Hac Vice; and Frank A. Shepherd of GrayRobinson, P.A., Miami, for appellee Robert Kraft.

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee; and Andrew B. Metcalf of the Law Offices of Green, Metcalf & Lazan, Vero Beach, for appellees Robert Freels, et al.

Tama Beth Kudman of Tama Beth Kudman, P.A., West Palm Beach, for appellee Hua Zhang.

Kathleen S. Phang of Katie S. Phang, P.A., Coral Gables; Zachary P. Hyman of Berger Singerman LLP, Miami; Christopher N. Bellows and Edward Diaz of Holland & Knight LLP, Miami; William N. Shepherd and

3

Jeff Schacknow of Holland & Knight, West Palm Beach, for appellee Lei Wang.

Michael S. Brown of the Law Office of Michael S. Brown, PLLC, Orlando, for appellees Lei Chen and Shen Mingbi.

Donnie Murrell, West Palm Beach, Amicus Curiae for Due Process Institute.

David Oscar Markus, National Co-Chair, Amicus Committee, Miami, Amicus Curiae for National Association of Criminal Defense Lawyers.

Andy Thomas, Public Defender, and Justin F. Karpf, Assistant Public Defender, Tallahassee, Amicus Curiae for The Florida Association of Criminal Defense Lawyers.

Leonard Feuer of Leonard Feuer, P.A., West Palm Beach, Amicus Curiae for Professor Stephen A. Saltzburg, Esq. of George Washington University Law School and Professor Ronald Goldstock, Esq. of New York University School of Law.

Harvey J. Sepler of Rimon, P.C., Hollywood, Amicus Curiae for The Independence Institute.

CIKLIN, J.

In these three consolidated cases,[1] the State of Florida appeals trial court orders granting motions to suppress non-audio video surveillance that was recorded with hidden cameras covertly installed inside massage parlors suspected of housing prostitution activity. We find the trial courts properly concluded that the criminal defendants had standing to challenge the video surveillance and that total suppression of the video recordings was constitutionally warranted.

## I. Factual Background

---

[1] This court previously consolidated these three appellate cases (*State v. Kraft*, 4D19-1499, *State v. Freels*, 4D19-1655, and *State v. Zhang*, 4D19-2024) for purposes of resolution by the same panel. After a consolidated oral argument, we now consolidate these cases for purposes of this opinion. In *State v. Freels*, 4D19-1655, this court previously consolidated for all purposes more than 100 related cases raising the same issues.

4

These cases arise from investigations conducted by three law enforcement agencies on two massage parlors. We summarize the relevant facts of each investigation and the procedural posture leading to these appeals.

### A. The Jupiter Police Department's Investigation of the Orchids of Asia Day Spa in Jupiter, Florida - *Kraft*, 4D19-1499 and *Zhang*, 4D19-2024

Detectives with the Martin County Sheriff's Office were investigating prostitution and possible human trafficking at massage parlors in Martin County. They alerted a Jupiter Police Department detective about the Orchids of Asia Day Spa in the Town of Jupiter because one of Orchids of Asia Day Spa's former employees was allegedly managing the massage parlor being investigated in Martin County.

The Jupiter detective began researching websites that advertise prostitution services and found ads classifying the spa as a massage business where female employees offer a sexual act involving manual manipulation of the male genitals for money.

Jupiter police surveilled the spa for several days and observed more than 100 men enter and remain for 30 to 60 minutes. A few women entered the spa, and they exited soon after, leading the detective to conclude that the female patrons had not obtained prostitution services. The spa kept odd hours, sometimes staying open until midnight.

The detective contacted and shared his concerns with an investigator with the Florida Department of Health, who conducted an annual inspection. During the health inspection, the spa's manager appeared nervous. As the inspector entered rooms containing beds, clothing, a flat iron, and other personal items, the manager tried to cover things with a blanket.

During the health inspection, Jupiter police saw a woman discard something in the dumpster outside the spa. Police pulled trash from the dumpster and retrieved tissues with seminal fluid. Police also found receipts matching a name ("Lulu") seen on one of the illicit massage websites. In furtherance of their investigation, police pulled over four men seen leaving the spa, and each one admitted to the detective that they paid a fee to receive manual stimulation at the end of the massage. Three of the men identified the spa employees that provided the services.

The Jupiter detective then applied for a warrant to install secret, non-audio video cameras in the spa and to monitor and record the video. A magistrate issued a warrant allowing police to install hidden cameras at the spa in places where prostitution was believed to be occurring and in the lobby. The warrant prohibited cameras in areas where prostitution was not suspected, such as the kitchen, bathroom, and personal bedrooms.

The warrant allowed non-audio video recording for no more than five days to obtain evidence of prostitution and the felony offense of deriving support from the proceeds of prostitution. The warrant did not discuss or otherwise direct any police conduct related to "minimization," and the detectives were not given any type of formal written instructions about how to minimize.

Using a phony bomb threat to clear the building, police installed hidden cameras in four of the spa's massage rooms and in the lobby. Three detectives monitored and recorded video from the hidden cameras over five days. The cameras recorded video continuously, but Jupiter detectives monitored the video feeds only during business hours.

The detectives toggled between the video feeds when they displayed or when they thought they might soon display criminal conduct. They focused on the end of the massages because the sexual conduct typically occurred at the end. In all, police recorded 25 spa customers pay for sexual services. Ten more customers were suspected to have paid for sex, but the offenses could not be confirmed due to dim lighting. Four customers, including two women, were recorded who did not engage in illegal activity.

In *Kraft*, 4D19-1499, the appellee was filmed visiting the spa on two occasions and was stopped by the police while driving away after his second visit. He was later charged with two misdemeanor counts of soliciting prostitution.

In *Zhang*, 4D19-2024, the spa's employees—including the owner (Hua Zhang) and manager (Lei Wang)—were charged with misdemeanor and felony prostitution-related offenses.

Kraft and the spa employees moved to suppress the videos of the prostitution offenses on several grounds. The county court in Kraft's misdemeanor case granted the motion to suppress because the search

warrant was deficient in failing to set out "minimization"[2] procedures and because police did not sufficiently minimize the recording of conduct outside the scope of the warrant.

Additionally, the county court in Kraft's case certified three questions of great public importance:

    a. Does Defendant have standing to raise a Fourth Amendment defense to the Search Warrant Affidavit and Search Warrant, presented in this case? and,

    b. Does the Search Warrant satisfy Fourth Amendment requirements? and,

    c. Was the Search Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

This court accepted jurisdiction.

Likewise, the circuit court in *Zhang* suppressed the videos on the same grounds, and the state has timely appealed both matters.

### B. The Indian River County Sheriff's Office Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655[3]

The Indian River County Sheriff's Office began investigating the East Sea Spa in Sebastian, Florida, after learning that other law enforcement agencies were combating illicit massage businesses in their jurisdictions. A sergeant discovered that the spa had posted ads for sexual services on websites. The assigned sergeant surveilled the business and observed a disproportionate number of men visiting the spa. Many of the men looked around the parking lot suspiciously before entering. One man, a registered

---

[2] The term "minimization" generally refers to warrant guidelines or techniques to be applied by law enforcement agents to narrow, or minimize, the breadth of the activity that is surveilled. *See generally People v. Floyd*, 360 N.E.2d 935, 939-40 (N.Y. 1976) (citing *Berger v. New York*, 388 U.S. 41 (1967)). As will be further discussed in our analysis, the minimization requirement "has its underpinnings in the Fourth Amendment interdiction of unreasonable search and seizures and its mandate that search warrants contain provisions 'particularly describing the place to be searched, and the persons or things to be seized.'" *Id.* at 940.
[3] The appeals in *Freels*, 4D19-1655, concern investigations conducted by two separate law enforcement agencies on the spa at issue. The investigations have distinct facts. The parties were permitted to file separate briefs concerning the two investigations.

sex offender, fled the spa upon seeing a uniformed officer in the parking lot.

The sergeant pulled trash and located tissues with seminal fluid. He stopped two men leaving the spa, and they admitted that they paid for sexual gratification at the end of the massage.

The sergeant suspected that the female massage workers were living in the spa. Throughout his surveillance, he never saw the women leave at night and saw them leave just one time to shop at a department store. A Department of Health inspector conducted an inspection and observed clothing, suitcases, food, bedding, and other indicia that someone was living in the building.

The sergeant applied for a warrant to install hidden, non-audio video cameras in areas where prostitution was believed to be occurring. A magistrate issued the warrant and authorized monitoring for 30 days. The warrant instructed the detectives monitoring the video feeds to take steps to minimize the invasion of privacy to customers not engaged in illegal activity.

Law enforcement officials installed hidden cameras in the massage rooms and lobby. Two detectives monitored the video feeds for nine days over the ensuing 30-day period and recorded 43 acts of prostitution. Some of the sex acts occurred at the beginning or middle of the massages but most occurred at the end. When not monitoring the video feeds, the cameras were turned off and did not record.

After installing the cameras, the detectives learned that they could not entirely control the specific video feeds that would be recorded. They had the option to record none, one, or all four of the massage rooms at the same time. If two men were receiving illegal massages in rooms 1 and 2, and a woman entered room 3 for a legal massage, the detectives could not record the men without also recording the woman's spa services.

Police opted to continue recording under these circumstances, and as a result, four women were recorded receiving lawful massages. The detectives would toggle to the video of the suspect massages and take the women's massages off-screen. The women's massages were recorded but not viewed. When only one man was receiving an illegal massage, the detectives turned off the recording of the woman's massage. If only a woman was in the spa, they would stop recording altogether.

After the 30-day period expired, the detectives obtained a second warrant for another 30 days and monitored the video feeds for four more days. During the 13 days the cameras were monitored, police recorded a total of 67 massages and 63 of them involved prostitution. Every man that entered the spa paid for sexual services. Up to ten women received lawful massages during this span, and, as noted, four were recorded. The recordings were stored on a secure server that only the detectives could access.

The state brought misdemeanor solicitation of prostitution charges against numerous men recorded in the videos. The owner of the East Sea Spa is being prosecuted on felony charges in *Zhang*.[4]

The defendants moved to suppress the videos on several grounds. The county court judge suppressed the videos because law enforcement failed to minimize the intrusion on the privacy rights of law-abiding spa-goers and the warrant provided no written criteria for minimization. The judge noted the disturbing fact that innocent women were recorded in various stages of undress while receiving lawful massages.

The county court certified four questions of great public importance:

a. Did the Defendant have a legitimate expectation of privacy such that he is entitled to claim the protection of the Fourth Amendment? and,

b. Did the issuing Court have authority under the Fourth Amendment to authorize a Video Surveillance Warrant? and,

c. If the issuing Court had the power to authorize a Video Surveillance Warrant, does the Video Surveillance Warrant issued in this case satisfy Fourth Amendment requirements? and,

d. If the issuing Court had the power to authorize a Video Surveillance Warrant and the Warrant satisfied Fourth Amendment requirements, was the Video Surveillance Warrant executed in a manner sufficient to satisfy Fourth Amendment requirements?

---

[4] Police believed that at least one of the workers at the spa was a victim of human trafficking although no such charges have been brought to date.

This court accepted jurisdiction.

### C. *The Vero Beach Police Department Investigation of the East Sea Spa in Sebastian, Florida - Freels, 4D19-1655*

The Vero Beach Police Department began investigating the East Sea Spa after receiving citizen complaints that prostitution might be occurring there. A detective reviewed adult websites with ads showing the spa offered prostitution services. The detective discovered that the spa's manager, Lanyun Ma, who is also the wife of the spa's owner, had been arrested for prostitution and human trafficking offenses in New York and Massachusetts. She pleaded guilty to prostitution offenses in those cases.

An undercover detective visited the spa posing as a client. After the massage, the masseuse touched his groin and offered sexual activity for money. The detective made up an excuse and declined the offer, but on his second visit, the masseuse grew suspicious and accused him of being "police." The detective leading the investigation opted against further undercover operations to avoid tipping off the spa.

Police pulled over two men seen leaving the spa, and both agreed to speak with the officers and reported experiences similar to the undercover detective's.

Police surveilled the spa and learned that the massage workers lived in the building and did not leave at night. When workers did leave the spa, they did so only under the spa manager's supervision. The spa's clientele was "exclusively male," and no female clients were seen during a three-week period.

Trash pulls produced napkins with seminal fluid, used condoms, and a package for a sex toy.

A magistrate issued a warrant for non-audio video surveillance inside the spa for no longer than 30 days. The warrant instructed detective-monitors to "take steps to minimize the invasion of privacy to any parties not engaged in the unlawful acts set forth in the affidavit."

Law enforcement officials installed hidden cameras and used them to monitor and record spa customers as they undressed and received massages in private massage rooms. For the first 20 days, two detectives monitored the video feeds from 8 a.m. to 11 p.m. The cameras, however, recorded for the full 30 days. Police observed nearly 100 sex acts during this period. The recordings made while the detectives were not monitoring

the feeds had not been viewed by anyone.  The video is stored on a hard drive in the police department's evidence lockup.

The lead detective applied for an extension of the 30-day surveillance period, noting that police had witnessed the counting of large sums of money and women being transported to and from the spa.  The spa's manager and a man named Kenneth Zullo had brought new massage workers to the spa.  The women would stay at the spa for several days or weeks before being moved to a different location.  Every woman transported to the spa engaged in prostitution there.

A judge approved an extension of the warrant and again instructed police to minimize the intrusion on lawful activity.  Detectives monitored the video feeds for 10 additional days.

In total, police monitored the video feeds for 30 out of the 60 possible days.  Of the 145 monitored massages, 142 involved an act of prostitution.  Two of the men who appeared to have received non-criminal massages had received prostitution services on other visits to the spa.  Only one man monitored and recorded by police was not seen receiving sexual services.

Most of the prostitution occurred at the end of the massage (83 times) but on some occasions (59 times) the massages began with the act of prostitution.  This complicated efforts to minimize because, if the detectives did not monitor the beginning of the massages, they may have missed an act of prostitution.

Numerous defendants were charged with misdemeanor counts of soliciting prostitution.  One of the massage workers told police that she committed the acts against her will and was in fear.  Police suspected that at least one individual was a victim of human trafficking.

The defendants in the misdemeanor cases moved to suppress the videos on many grounds.  The county court suppressed the videos, concluding that police failed to minimize the intrusion on the privacy of individuals not engaged in unlawful activity.  The court noted that, while police monitored the feeds only 50% of the allowed time, the cameras recorded for the entire 60 days.  Although only three lawful massages were monitored, the court suspected that more innocent spa clients may have been recorded.

The county court certified the same four questions set out in the discussion of the Indian River County Sheriff's Office's investigation. This court accepted jurisdiction.[5]

## II. Standard of Review

> The trial court's ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court's ruling. *Pagan v. State,* 830 So. 2d 792, 806 (Fla. 2002). While the appellate court is bound by factual determinations which are supported by competent substantial evidence, it reviews mixed questions of fact and law *de novo. Cote v. State,* 14 So. 3d 1137, 1139 (Fla. 4th DCA 2009).

*Kelly v. State*, 77 So. 3d 818, 821 (Fla. 4th DCA 2012).

## III. Analysis

On appeal, the state argues that the trial courts erred in suppressing the video evidence because (1) the defendants lack standing to raise a Fourth Amendment challenge, (2) the warrants were not deficient because minimization is not a requirement under the Fourth Amendment, and (3) even if the warrants were deficient, the "good faith" exception to the exclusionary rule should apply. As we explain below in addressing each of these three arguments, we disagree. In the absence of any binding Florida law concerning silent video surveillance like that conducted in this case, the trial courts properly applied well-settled and persuasive federal law on the issue.

### A. The Defendants Have Standing to Raise a Fourth Amendment Defense

Our analysis begins with the Fourth Amendment's prohibition on unreasonable searches, which protects individual privacy against certain types of government intrusion:

---

[5] The defendants in *Freels*, 4D19-1655, filed notices of cross-appeal and have argued alternative bases to support the suppression orders. Our jurisdiction to review the defendants' appeals from the trial courts' non-final rulings is questionable. Defendants have essentially argued "tipsy coachman" grounds for affirmance. In this opinion, we do not decide the issues argued in the cross-appeals as it is not necessary to do so.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amend. IV, U.S. Const.

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351 (1967). Thus, to establish standing to raise a Fourth Amendment violation, a defendant must demonstrate a legitimate expectation of privacy in the area searched or the item seized. The inquiry involves two distinct questions: (1) whether the individual has "exhibited an actual (subjective) expectation of privacy" – i.e., whether the individual has shown that he or she seeks to preserve something as private; and (2) whether the subjective expectation of privacy is one that society recognizes as reasonable – i.e., whether the expectation is objectively "justifiable" under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quoting and applying *Katz* as the Court's "lodestar" for whether a particular form of government-initiated electronic surveillance is a search within the meaning of the Fourth Amendment). "Consistently with *Katz,* this court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith*, 442 U.S. at 740.

The spa-client defendants in all of these cases had a subjective and objectively reasonable expectation of privacy in the massage parlor rooms. The surveillance took place in a professional private setting where clients are expected to partially or fully disrobe. The spa owners and their employees also had a reasonable right to expect that the interactions with nude or partially nude clients in the massage rooms would not be exposed to the public. As soon as the door to the massage room was closed, they had a reasonable expectation of privacy. *See Katz*, 389 U.S. at 351 ("[W]hat he [or she] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); *Ramirez v. State*, 654 So. 2d 1222, 1223 (Fla. 2d DCA 1995) ("As soon as Ramirez entered the closed toilet stall he had a legitimate expectation of privacy . . . ."). Thus, the business owner, workers, and clients have standing to challenge the subject searches.

Florida statutory law further lends support to our conclusion that the defendants enjoyed a legitimate expectation of privacy in the massage rooms. While Florida has no statute that expressly addresses warrants for surreptitious, video-only surveillance by police, the Florida Legislature has recognized a legitimate expectation of privacy in this type of location in at least two statutes. Florida's statute defining the offense of video voyeurism defines when a person has a reasonable expectation of privacy:

> "Place and time when a person has a reasonable expectation of privacy" means *a place and time when a reasonable person would believe that he or she could fully disrobe in privacy, without being concerned that the person's undressing was being viewed, recorded, or broadcasted by another,* including, but not limited to, the interior of a residential dwelling, bathroom, changing room, fitting room, dressing room, or tanning booth.

§ 810.145(1)(c), Fla. Stat. (2019) (emphasis added). Likewise, as noted by the trial court in *Kraft,* section 877.26, Florida Statutes (2019), prohibits merchants from "observ[ing] or mak[ing] use of video cameras or other visual surveillance devices to observe or record customers in the merchant's dressing room, fitting room, changing room, or restroom *when such room provides a reasonable expectation of privacy.*" (Emphasis added).

These laws clearly undermine the state's argument that the defendants lacked standing because they had, at most, a diminished expectation of privacy in a business open to the public. As is long settled, "[t]he Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351 (rejecting the "trespass doctrine" espoused in past cases like *Olmstead v. United States*, 277 U.S. 438, 464 (1928), which had limited the Fourth Amendment to searches and seizures of tangible property, and holding that attaching a listening device to the outside of a public phone booth was a search that violated the Fourth Amendment).

The state also argues that the spas were primarily used as a brothel, as most of the customers who were recorded and monitored engaged in unlawful activity, and thus, the state asserts, the defendants cannot rely on the Fourth Amendment rights of third parties who had their innocent conduct recorded. However, as case law shows us, Fourth Amendment rights are nearly always safeguarded by those who are criminally prosecuted. *See, e.g., Katz,* 389 U.S. at 348 (reversing judgment of conviction for transmitting wagering information by telephone).

Consequently, the state's circular argument that the defendants lacked a privacy interest because they were engaging in criminal behavior is uncompelling.

The trial courts properly concluded that the defendants had standing to challenge the search.

## B. Minimization Requirements are Applicable to the Surveillance at Hand, and the Requirements were not Properly Defined or Applied

The state next argues that the trial courts erred in determining that adequate minimization procedures were neither defined nor applied because there are no minimization requirements within the text of the Fourth Amendment.

The act of video surveillance itself is perhaps the most intrusive form of electronic law enforcement spying. As the Tenth Circuit held: "The use of a video camera is an extraordinarily intrusive method of searching." *United States v. Mesa-Rincon,* 911 F.2d 1433, 1442 (10th Cir. 1990). "Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. [However,] [i]t is even more invasive of privacy, just as a strip search is more invasive than a pat-down search . . . ." *Id.* at 1442-43 (alterations and emphasis in original) (quoting *United States v. Torres,* 751 F.2d 875, 885 (7th Cir. 1984)).

Presently there exists no binding Florida statute, Florida decisional law, or rule of criminal procedure that addresses this type of surreptitious, video-only surveillance as a law enforcement investigative tool.[6] Likewise, the text of the Fourth Amendment does not expressly reference the term "minimization." As a result of that void, the state maintains that this court need look no further than the plain text of the Fourth Amendment's Warrant Clause "because the existing probable cause and particularity requirements [of the Warrant Clause] amply safeguard protected privacy

---

[6] As the state contends, the electronic video surveillance at issue is not subject to the strictures of Florida's statute governing the security of communications and surveillance (chapter 934, Florida Statutes – Florida's "wiretapping statute") because the video cameras did not record audio. Chapter 934 protects the privacy of and restricts the interception of "wire and oral communications." § 934.01(2), Fla. Stat. (2019). In *Minotty v. Baudo*, 42 So. 3d 824, 832 (Fla. 4th DCA 2010), an appeal from a civil judgment for damages under chapter 934, this court held that silent video surveillance was not covered by the act, which applies solely to the interception of wire, electronic, or oral communications.

interests." However, the state's argument ignores many years of clear federal jurisprudence on this issue.

"[G]eneral fourth amendment requirements are still applicable to video surveillance; and suppression is required when the government fails to follow these requirements." *Mesa-Rincon*, 911 F.2d at 1437. In *Mesa-Rincon*, the Tenth Circuit rejected arguments that the district court lacked authority to authorize a search via silent video surveillance and that the warrant application did not satisfy Fourth Amendment requirements. *Id.* at 1446. In consideration of "the underlying purposes of the fourth amendment and the intrusiveness of video surveillance," the Tenth Circuit adopted "five requirements for video surveillance that define more specifically the probable cause and particularity requirements of the fourth amendment," and which requirements expressly include the minimization requirement:

> An order permitting video surveillance shall not be issued unless: (1) there has been a showing that probable cause exists that a particular person is committing, has committed, or is about to commit a crime; (2) the order particularly describes the place to be searched and the things to be seized in accordance with the fourth amendment; (3) *the order is sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation*; (4) the judge issuing the order finds that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous; and (5) the order does not allow the period of interception to be longer than necessary to achieve the objective of the authorization, or in any event no longer than thirty days.

*Id.* at 1437 (emphasis added).

The test derives from U.S. Supreme Court case law setting forth "the minimum constitutional standards" for secret audio surveillance. *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986) (applying the minimum constitutional standards required for audio surveillance set out in *Katz*, 389 U.S. at 354–59, and *Berger v. New York*, 388 U.S. 41, 58-59 (1967), to video surveillance). "Given the obvious similarities between aural and video electronic surveillance, we believe that the same constitutional standards governing the former should be applied in determining whether or not to authorize the latter." *Biasucci*, 786 F.2d at 510. The *Mesa-Rincon* formulation of the test has been expressly adopted and applied by other federal circuit courts of appeal. *E.g., United States v.*

*Falls*, 34 F.3d 674, 680 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992).

Notably, the warrant applications in the cases now on appeal cited *Mesa-Rincon* and sought to comply with its requirements.

Thus, it is clear that federal law has been sufficiently developed on this constitutional issue, and it is clear the trial courts did not err in determining that minimization is required. Indeed, the state's argument for a strict textual reading of the Fourth Amendment runs counter to decades of case law from the U.S. Supreme Court, such as *Berger*, 388 U.S. at 51, where the Court recognized that it had receded from the strict textual approach that was applied in *Olmstead*, 277 U.S. 438. "Statements in [*Olmstead*] that a conversation passing over a telephone wire cannot be said to come within the Fourth Amendment's enumeration of 'persons, houses, papers, and effects' have been negated by our subsequent cases . . . ." *Berger*, 388 U.S. at 51. Should there be any doubt, as the state respectfully urges, that minimization procedures "are not *constitutionally* required by the Fourth Amendment" (emphasis in original), we hereby find they are and caution that to hold otherwise would be directly counter to the Constitution, civil liberties, and the rule of law.

We likewise uphold the trial courts' conclusions that the warrants failed to contain sufficient minimization guidelines and that police did not sufficiently minimize the video recording of innocent spa goers receiving lawful massages. "The purpose of the minimization requirement is to avoid the recording of activity by persons with no connection to the crime under investigation who happen to enter an area covered by a camera." *Mesa-Rincon*, 911 F.2d at 1441. "The minimization question is one of reasonableness." *Id.* (quoting *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir. 1987)).

The warrants at issue did not set forth any specific written parameters to minimize the recording of innocent massage seekers, and law enforcement did not actually employ sufficient minimization techniques when monitoring the video or deciding what to record. In all the investigations, some innocent spa goers were video recorded and monitored undressed. There was no suggestion or probable cause to believe that female spa clients were receiving sexual services, yet law enforcement largely failed to take the most reasonable, basic, and obvious minimization technique, which was simply to not monitor or record female spa clients.

The most egregious example is the investigation by the Vero Beach Police Department in the *Freels* case where the cameras recorded continuously for 60 days. Thirty days' worth of unmonitored recordings remain in the police department's possession in that case. Other innocent spa clients may have been recorded nude – or partially undressed – on those days. Those innocent clients potentially live with the knowledge that nude videos of themselves are preserved on a server somewhere with unknown accessibility. In our ever increasingly digital world filled with hackers and the like, such awareness renders the surveillance a particularly severe infringement on privacy.

We agree with the trial courts that this is unacceptable. The trial courts properly applied the federal case law enforcing the minimum constitutional standards for secret video surveillance, and the state has not overcome the presumption of correctness in the trial courts' ruling that the minimization requirement was not satisfied.

### C. Application of the Exclusionary Rule was Proper

Where evidence is obtained in an illegal search and seizure, the Fourth Amendment generally bars its use. *Mapp v. Ohio,* 367 U.S. 643, 648 (1961). "The primary rationale behind the exclusionary rule is to deter law enforcement from violating constitutional rights." *State v. Teamer*, 151 So. 3d 421, 430 (Fla. 2014). But like any good rule, it is not without exception.

The state contends that the "good faith" exception to the exclusionary rule set forth in *United States v. Leon,* 468 U.S. 897 (1984), should be applied because there was no judicial or statutory authority in Florida requiring minimization. In *Leon,* the Supreme Court declined to apply the exclusionary rule under circumstances that would not further its purpose of deterring unlawful police conduct. *Id.* at 922-23. The Court held that generally "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," there is generally "no police illegality and thus nothing to deter." *Id.* at 920-21. The Court reasoned:

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or … judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law." [*Stone v. Powell,* 428 U.S. 465, 498 (1976)] (BURGER, C.J., concurring). Penalizing the officer for the magistrate's error, rather than

his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Id.* at 921 (first alteration in original) (footnote omitted). The test under *Leon* is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.

We cannot conclude here that the law enforcement agencies acted in good faith with respect to minimization due to the lack of Florida law on point. The warrant applications themselves cited the decades-old federal law (such as *Mesa-Rincon*) setting out the requirements for obtaining a warrant to conduct secret video surveillance in private locations, including the need to minimize the recording of innocent conduct. These citations negate a finding of ignorance of minimization requirements.

We further reject the state's argument that only recordings of innocent conduct should be excluded.[7] In construing the remedy for a failure to minimize under Florida's wiretapping statute, the Florida Supreme Court has held:

> [W]here the procedural requirements to minimize interception are blat[a]ntly ignored, as we have found them to have been in the instant cause, the entire wiretap evidence must be suppressed; where violations of the minimization requirements occur [d]espite efforts to meet the minimization requirements, however, only the unauthorized interceptions need be suppressed.

*Rodriguez v. State*, 297 So. 2d 15, 21 (Fla. 1974).

The trial courts did not err in determining that the minimization requirements were ignored, as opposed to merely being unmet despite efforts to satisfy them. As previously discussed, the agencies failed to take the most basic and reasonable step of minimization by not monitoring or recording the unsuspected female clients. We ascribe no ill motives to the

---

[7] The state suggests that the remedy for the innocent spa clients is a civil lawsuit, like one already pending in federal court. We disagree. A costly, time-consuming civil remedy by unlawfully recorded persons is impractical and would not serve to meaningfully deter future violations. Were we to accept this argument, police in future cases could blatantly violate the privacy rights and Fourth Amendment protections of citizens and the only consequence would be the risk of future civil lawsuits that most citizens would not have the wherewithal to pursue.

procedural decisions made by the law enforcement agencies involved. But at best, each department was lulled into a zone of complacency where complacency cannot exist.

Under the facts of this case and guided by the Florida Supreme Court's holding in *Rodriguez,* the trial courts properly suppressed all of the unconstitutionally captured footage. To find otherwise in this context would undermine the purpose of the exclusionary rule—which is to deter future Fourth Amendment violations.

## IV. Conclusion

The type of law enforcement surveillance utilized in these cases is extreme. While there will be situations which may warrant the use of the techniques at issue, the strict Fourth Amendment safeguards developed over the past few decades must be observed. If they are not, any evidence obtained could very well be declared inadmissible as a matter of constitutional law. To permit otherwise would yield unbridled discretion to agents of law enforcement and the government, the antithesis of the constitutional liberty of people to be secure against unreasonable searches and seizures.

The federal case law cited herein pertaining to silent video surveillance is well reasoned and widely accepted. Consequently, we must hold—as every federal circuit court and state court to consider the question has— that this type of intrusive, covert video surveillance is subject to heightened standards and procedures designed to implement Fourth Amendment protections, particularly in the face of the constantly expanding use of electronic surveillance techniques by law enforcement. And where the government fails to faithfully follow these standards and procedures, it will be held to account by the exclusion of the evidence obtained. The Fourth Amendment demands no less under these circumstances.

The trial courts did not err in concluding that total suppression was the appropriate remedy under the circumstances of this case.[8]

---

[8] The parties and amici have argued additional issues and alternative grounds for affirmance that we do not decide as it is not necessary to do so. However, the need for law enforcement use of silent video recording is a matter that could be addressed by the Legislature.

Professors Stephen Saltzburg and Ronald Goldstock present strong arguments in their amicus brief why a warrant authorizing secret video surveillance (a

*Affirmed.*

GROSS, J., concurs.
MAY, J., concurs specially with opinion.

MAY, J., concurring specially.

I concur with the majority. I write to address a single issue raised by the Kraft defense because I believe it lends further support for our decision.

The right to privacy is guaranteed in Florida's Constitution. Art. I, § 23, Fla. Const. Also engrained within Florida's statutory and case law is the prohibition against the use of audio surveillance for prostitution-related offenses. *See* § 934.07, Fla. Stat. (2019); *State v. Rivers*, 660 So. 2d 1360, 1363 (Fla. 1995). These two formidable principles also compel an affirmance in this case.

In his answer brief, Kraft argues Florida provides a statutory basis for the suppression order, thereby avoiding the constitutional issue. *See Delacruz v. State*, 276 So. 3d 21, 26 n.1 (Fla. 4th DCA 2019) (declining to reach constitutional question because the appeal was disposed on other grounds). Specifically, he argues "[n]o Florida statute authorizes surreptitious video surveillance, nor have Florida courts approved it." While the State relies on Chapter 934, Kraft argues that section does not authorize the use of this surveillance type for prostitution-related offenses. *See* § 934.07(1)(a), Fla. Stat. I agree.

First, our legislature had expressly limited audio surveillance "to certain major types of offenses and specific categories of crime." *See* § 934.07, Fla. Stat. Second, our supreme court then held "section 934.07 cannot be read as authorizing wiretaps to investigate *non-violent prostitution-related* offenses without contravening the requirements of" the federal wiretap law. *Rivers*, 660 So. 2d at 1363 (emphasis added). And third, subsequent to *Rivers*, our legislature removed *all* prostitution-related offenses from section 934.07. Ch. 2000-369, § 10, at 8, Laws of

"sneak and peak" warrant) has no place in a prostitution case and why the invasive video surveillance conducted here was unnecessary. They make a compelling argument that—as with other electronic surveillance such as wiretapping—the drastic step of installing secret cameras in private locations was intended to be limited to serious crimes and used only as a last resort in extraordinary situations.

21

Fla (amending § 934.07, Fla. Stat. (1969)). This ensures that prostitution-related offenses are not considered "major types of offenses" warranting the significant intrusion of one's privacy by audio surveillance. *Cf. Rivers*, 660 So. 2d at 1362–63. The video surveillance in this case falls prey to that same limitation.

And while the State clings to section 933.02, Florida Statutes (2019), for life support, that provision's "plain text" simply authorizes a search *warrant* "[w]hen any property shall have been used: . . . [a]s a means to commit any crime." § 933.02(2)(a), Fla. Stat. It does not authorize this surveillance type for prostitution-related offenses. § 933.02, Fla. Stat.

Florida requires strict construction of "statutes authorizing searches." *Morris v. State*, 622 So. 2d 67, 68 (Fla. 4th DCA 1993). The State must adhere to that mandate. *See id.* Because Florida law does not expressly authorize either audio or video surveillance for prostitution-related offenses, the State's warrant was unauthorized and unsupported by Florida case law.

As Professors Stephen Saltzburg, Esq., and Ronald Goldstock, Esq., suggest in their amicus brief:

> The authorization of electronic or video surveillance for petty crimes as a steppingstone in an effort to investigate more serious offenses would make a mockery of the designated crime requirement. Such a subterfuge would violate the princip[le] that continuous invasions of privacy must be reserved for occasions when the need to do so was critical. . . . Florida law provides no basis for seeking a warrant for electronic eavesdropping of conversations in a misdemeanor prostitution case, and there is no reason to believe that either the legislature or judiciary would want to permit such warrants when intrusive video surveillance is at issue.
>     . . . .
>
> The need to limit electronic and visual surveillance to serious crimes is vital if a society continues to value personal privacy and freedom, even as the advance of technology poses unprecedented threats and intrusions. . . . The development and proliferation of compact, inexpensive, wireless video surveillance technology poses a unique, unprecedented threat to erode the personal privacy against government that Americans have enjoyed since the Founding. . . . And it has allowed the government to "record[] . . . in graphic visual detail

. . . very personal and private behavior" like "[n]o other technique" could. *United States v. Mesa-Rincon,* 911 F.2d 1433, 1442 (10th Cir. 1990).

Lastly, no good-faith exception can save the State's violation of both our statutory and case law limitation of similar types of surveillance. "The prohibition of [Chapter 934 is] absolute." *Atkins v. State,* 930 So. 2d 678, 682 (Fla. 4th DCA 2006). "Chapter 934 . . . unequivocally expresses the Legislature's desire to suppress evidence obtained in violation of that chapter. . . ." *State v. Garcia,* 547 So. 2d 628, 630 (Fla. 1989). Here, when law enforcement invoked Chapter 934, it was on notice that the chapter "cannot be read as authorizing [electronic surveillance] to investigate non-violent prostitution-related offenses." *Rivers,* 660 So. 2d at 1363. Good faith simply cannot exist in this legal environment.

Neither the Florida statutes, nor case law authorize covert audio surveillance to investigate prostitution-related offenses. It follows that the more intrusive video surveillance is also prohibited, providing yet another basis for affirmance.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***

23